# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| REBECCA A. MCEWEN-CRAYTHORN,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 1:12-cv-150-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Rebecca McEwen-Craythorn[1] filed this action asking this Court to reverse or remand the final agency decision denying her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C §§ 401–434. Ms. McEwen applied for DIB based on her "cervical disc disease, migraines, muscle spasms." (Admin. R. Doc. 83, certified copy tr. of R. of admin. proceedings: Rebecca A. McEwen-Craythorn (hereinafter "Tr. __").)The Administrative Law Judge ("ALJ") determined that Ms. McEwen did not qualify as disabled within the meaning of the Social Security Act. (Tr. 14.) Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the Commissioner's decision as supported by substantial evidence and applying the correct legal standards.[2]

---

[1] Plaintiff refers to herself as "Ms. McEwen." This Court will likewise refer to the Plaintiff.

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

# FACTUAL AND PROCEDURAL HISTORY

In March 2009, Ms. McEwen filed for DIB alleging an amended onset date of disability of April 11, 2008. (Tr. 14.) The Regional Commissioner denied Ms. McEwen's claims on June 5, 2009, and upon reconsideration on September 25, 2009. (*Id.*) At Ms. McEwen's request, a hearing before an ALJ took place on January 10, 2011 (the "Hearing"). (*Id.*) On March 15, 2011, the ALJ issued a decision (the "Decision") denying Ms. McEwen's claims. (Tr. 11–31.) On April 14, 2011, Ms. McEwen requested the Appeals Council review the ALJ's Decision. (Tr. 6.) The Appeals Council denied Ms. McEwen's request on May 11, 2012, (tr. 1–3), making the ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. section 405(g). *See* 20 C.F.R. § 404.981.

## I. Medical History

Ms. McEwen, born in November 1963, (tr. 44), has a history of back and neck pain, attention deficit disorder, migraines, depression, anxiety, and sleep difficulties. (Tr. 406, 409, 411.) Dr. Brannick Riggs treated Ms. McEwen for these ailments from at least 2006, (*id.*), through 2010, (tr. 450–53). On April 14, 2008, Ms. McEwen visited Dr. Riggs to have him complete Family and Medical Leave Act ("FMLA") paperwork. (Tr. 309.) Dr. Riggs's notes describe Ms. McEwen as suffering no apparent distress nor any unusual anxiety or evidence of depression. (*Id.*)

Ms. McEwen also saw Dr. Spencer Richards, M.D., and Dr. Benjamin Betteridge, M.D., for neck problems. (Tr. 260, 271.) On April 23, 2008, Dr. Richards administered a trigger point injection that provided Ms. McEwen some relief. (Tr. 271.) On April 30, Dr. Betteridge

administered another trigger point injection.  (Tr. 272.)  Ms. McEwen also complained of a migraine during that visit but stayed on her then-current medication regimen.  (*Id.*)

Ms. McEwen visited Dr. Riggs again twice in May 2008.  (Tr. 310–13.)  Dr. Riggs refilled Ms. McEwen's prescriptions and administered additional trigger point injections.  (*Id.*)  Ms. McEwen reported to Dr. Riggs that she hoped to return to work soon.  (Tr. 312.)  In June 2008, Ms. McEwen asked Dr. Riggs to complete additional FMLA paperwork since her employer would not allow her to return to work part time.  (Tr. 314.)  She visited Dr. Riggs again at the end of that month; Dr. Riggs's notes of that visit state Ms. McEwen reported her medication worked well.  (Tr. 316.)

In July 2008, Ms. McEwen saw a rheumatologist, Dr. John Mijer, at Dr. Betteridge's referral.  (Tr. 238.)  Dr. Mijer diagnosed Ms. McEwen with cervical spondylosis and degenerative disc disease from C4-5 through C6-7.  (Tr. 240.)  Dr. Mijer found "[n]o evidence of neuroforaminal narrowing or spinal stenosis."  (*Id.*)  Dr. Mijer recommended Ms. McEwen try using a TENS unit for pain relief.  (*Id.*)  Dr. Mijer also noted he, "[f]rom an arthritis standpoint" could not "completely explain the degree and intensity of Ms. Mcewen-Craythorn's pain other than a chronic pain syndrome."  (*Id.*)

Ms. McEwen saw Dr. Betteridge for trigger point injections a number of times throughout the rest of 2008.  (Tr. 281–82, 284.)  During an October visit, Ms. McEwen reported an interest in trying physical therapy again and stated she was seeking employment.  (Tr. 284.)

Ms. McEwen also continued treatment with Dr. Riggs.  Dr. Riggs administered additional trigger point injections in September 2008, (tr. 322–23), and February and July 2009, (tr. 331–32, 509).  Dr. Riggs's wrote a letter in February 2009 stating "it would not be detrimental to [Ms. McEwen's] health to start working part time and then possibly work in to a full time position if

[her] symptoms do not recur." (Tr. 523.) Dr. Riggs's notes from April and May 2009 indicate he found Ms. McEwen "doing well." (Tr. 514, 517.)

Ms. McEwen underwent an MRI on August 21, 2009, which showed multilevel degenerative disc disease, disc bulge, disc protrusion, and impingement upon the anterior thecal sac, and patent neural foramina. (Tr. 375–76.) A few days later, on August 25, Ms. McEwen reported "doing well" and asked to decrease her Lortab. (Tr. 506.) On September 17, 2009, Ms. McEwen told Dr. Riggs she had significant anxiety and depression the last two weeks. (Tr. 504.)

Ms. McEwen continued treatment from Dr. Riggs throughout 2010. (*See* Tr. 450–90.) Although she felt good in early April 2010, (tr. 465), she complained of a "rough month" of neck and back pain just a few weeks later, (tr. 462). By late May 2010 Ms. McEwen reported "doing well without any complaints." (Tr. 459.)

## II. Mental Health History

Ms. McEwen has a history of attention deficit disorder, anxiety, and depression. (Tr. 406, 409.) On September 29, 2008, Ms. McEwen went to the emergency room with suicidal ideation. (Tr. 247.) However, she decided not to harm herself, and the hospital discharged her to her brother's care. (Tr. 250–51.)

In November 2009, after evaluating Ms. McEwen's potential for neck surgery, Dr. Bryson Smith, M.D., referred Ms. McEwen to Dr. Mark Corgiat, Ph.D., for a psychological evaluation to further evaluate her potential for surgery. (Tr. 398, 428.) Dr. Corgiat found Ms. McEwen suffered "very significant psychological difficulties that are probably quite contributory to her pain and associated functional difficulties." (Tr. 428.) Dr. Corgiat noted Ms. McEwen had a long history of anxiety and showed significant symptoms of depression. (Tr. 431.) Dr.

Corgiat recommended Cognitive Behavioral Therapy and follow-up treatment with Ann Nielsen, M.S.W. (Tr. 431–32.)

Ms. Nielsen treated Ms. McEwen for anxiety and depression four times between December 2009 and January 2010, mainly working on coping skills. (*See* tr. 435–38.) On January 20, 2010, Ms. Nielsen completed an insurance questionnaire selecting "Yes, Ms. Craythorn's anxiety and depression would preclude her from performing the job duties of any occupation." (Tr. 439.) Under the area for additional comments Ms. Nielsen only wrote "at this time." (*Id.*) Ms. Nielsen continued to work with Ms. McEwen between January and March 2010. (*See* tr. 441–45.)

On July 26, 2010, Ms. McEwen went to the emergency room complaining of depression and a possible overdose. (Tr. 620–21.) That Ms. McEwen had just had to euthanize the family cat appeared to have precipitated the episode. (Tr. 621.) The hospital discharged Ms. McEwen after approximately three hours. (*See* tr. 630.)

### III. Work History

From approximately 1984 to 1994, Ms. McEwen worked as a cashier at Smith's grocery stores. (Tr. 46, 191.) In addition to lifting groceries, this job required Ms. McEwen stock shelves, schedule employees, and order product, among other things. (Tr. 192.) Ms. McEwen then worked for IHC as a file clerk doing medical insurance billing/posting from approximately 1996 to November 2005. (Tr. 44–45, 191.) In February 2006, Ms. McEwen switched positions to medical billing, which she held until April 2008. Ms. McEwen's job duties as a file clerk required her to gather records, handle mail, respond to requests for records, and prepare charts for the copy service, among other things. (Tr. 45–46.) At the hearing before the ALJ, Ms.

McEwen testified that she had to stop working in IHC's medical billing department in April 2008 because of pain and sleep problems. (Tr. 46.)

## STANDARD OF REVIEW

42 U.S.C. section 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards. 42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court

"will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax,* 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## **ANALYSIS**

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover,

the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Ms. McEwen's claim through step five, making the following findings of fact and conclusions of law:

1. "[Ms. McEwen] meets the insured status requirements of the Social Security Act through December 31, 2013." (Tr. 16.)
2. "[Ms. McEwen] has not engaged in substantial gainful activity since April 11, 2008, the amended alleged onset date (20 CFR 404.1571 *et seq*.)." (*Id.*)
3. "[Ms. McEwen] has the following severe impairments: degenerative disc disease of the cervical spine with headaches, migraines, depression and anxiety (20 CFR 404.1520(c))." (*Id.*)

4. "[Ms. McEwen] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." (*Id.*)
5. "[Ms. McEwen] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except such work could not require:

   - Standing more than 15 minutes or walking more than 15 minutes at one time, nor more than 2 total hours in an 8-hour day;
   - Sitting more than 20 minutes at one time, nor more than 6 total hours in an 8-hour day;
   - Overhead lifting or overhead reaching on more than a 'less than occasional' basis;
   - More than frequent reaching, handling and fingering which means 1/3 to 2/3 of the day;
   - Working at more than a low stress level, which means working only occasionally with the general public;
   - Working at more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks;
   - Working at more than a low memory level, which means the ability to understand, remember and carry out only 'simple' work instructions; and
   - Less than occasional flexion and extension of the neck and < less than occasional twisting of the neck." (Tr. 17–18.)

6. "[Ms. McEwen] is unable to perform any past relevant work (20 CFR 404.1565)." (Tr. 29.)
7. "[Ms. McEwen] was born on November 4, 1963 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563)."[3] (*Id.*)
8. "[Ms. McEwen] has at least a high school education and is able to communicate in English (20 CFR 404.1564)." (*Id.*)
9. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Ms. McEwen] is 'not disabled,' whether or not [she] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." (*Id.*)
10. "Considering [Ms. McEwen's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant

---

[3] Ms. McEwen was 42 years old on her original alleged disability onset date of February 1, 2006, but 44 years old on her amended disability onset date of April 11, 2008. (*See* tr. 14, 29.)

> numbers in the national economy that [Ms. McEwen] can perform (20 CFR 404.1569 and 404.1569(a))." (*Id.*)
> 11. "[Ms. McEwen] has not been under a disability, as defined in the Social Security Act, from April 11, 2008, through the date of this decision (20 CFR 404.1520(g))." (Tr. 31.)

In short, the ALJ concluded Ms. McEwen did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that she had the residual functional capacity to perform sedentary work with some limitations, and thus she did not qualify as disabled within the meaning of the Act. (Tr. 14–31.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. McEwen argues the ALJ erred: (1) by rejecting the opinions of Ms. McEwen's treating and examining medical providers; (2) by failing to conduct a proper step-three analysis; and (3) by improperly relying on vocational-expert testimony at step five. (Pl.'s Br. 15, 21–22, ECF No. 22.)

## I. Evaluation of Medical Opinions

Ms. McEwen argues the ALJ erred by rejecting the opinions of her treating and examining medical providers because the ALJ did not provide legitimate reasons for rejecting the opinions. (Pl.'s Br. 15–21, ECF No. 22.) The Court disagrees.

An ALJ must evaluate every medical opinion. 20 C.F.R. § 404.1527(c). If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors. 20 C.F.R. section 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

See *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted). To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'" *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty to resolve conflicting medical evidence).

Here, the ALJ did not accord controlling weight to Ms. McEwen's treating medical provider's opinion. Instead, the ALJ's Decision provided specific, legitimate reasons for granting "little weight" to Dr. Riggs's opinion. (Tr. 27–29.) The ALJ found the nature and severity of Ms. McEwen's impairments were "not well supported by medically acceptable clinical and laboratory techniques." (Tr. 28.) The ALJ also found Dr. Riggs's opinions inconsistent with other medical evidence. (*Id.*) For example, the ALJ noted Ms. McEwen's doctors repeatedly found her in no apparent distress and with normal to slightly limited range of motion. (Tr. 21–23.) The ALJ also noted Ms. McEwen responded well to conservative treatment, particularly trigger point injections. (Tr. 24.) In March 2008, Dr. Riggs decreased

Ms. McEwen's OxyContin and Lortab prescriptions because she reported "doing well." (*Id.*) Ms. McEwen requested further reduction in her Lortab prescription in August 2009 because "she needed less." (*Id.*)

In addition, the ALJ found Dr. Riggs's progress notes did not support the limitations he espoused. (Tr. 28.) For example, the ALJ noted that whereas Dr. Riggs indicated that Ms. McEwen needed back and neck support at all times, no treating or examining physician— including Dr. Riggs—recommended a neck brace. (*Id.*) The ALJ also noted that Dr. Riggs's opinion that Ms. McEwen could sort and handle papers or files directly contradicts Dr. Riggs's assessment that Ms. McEwen could perform no fine manipulation. (*Id.*) Lastly, the ALJ noted inconsistencies between Dr. Riggs's statements that Ms. McEwen's medications have side effects, including fatigue, and his progress notes, which show Ms. McEwen indicated no side effects, including no fatigue after January 2010. (Tr. 28.)

The ALJ also accorded "little weight" to Ms. Ann Nielsen's opinion. (Tr. 28.) In support, the ALJ noted that social workers do not qualify as acceptable medical sources. (*Id.*) The ALJ also noted Ms. Nielsen's "progress notes do not support her conclusion because they contain only [Ms. McEwen's] self-report of no improvement." (*Id.*) Because the ALJ already discredited Ms. McEwen,[4] Ms. Nielsen's evaluation becomes suspect. (Tr. 18–21.) While Ms. Nielsen did opine that Ms. McEwen's anxiety and depression precluded her from working at that time, (tr. 439), the Social Security regulations reserve that determination for the Commissioner, 20 C.F.R. § 404.1527(d)(1)–(3) (stating treating source opinions on issues reserved to the Commissioner never entitled to any special significance); *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (noting treating physician's opinion on a

---

[4] Ms. McEwen does not challenge the ALJ's evaluation of her own credibility.

claimant's ability to work does not bind the Commissioner and remains the Commissioner's ultimate determination). Thus the ALJ could appropriately accord little weight to Ms. Nielsen's opinion. "In the case of a nonacceptable medical source like [Ms. Nielsen], the ALJ's decision is sufficient if it permits us to 'follow the adjudicator's reasoning.'" *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (citing SSR 06-03P, 2006 WL 2329939, at *6 (Aug. 9, 2006)). The ALJ's decision meets this standard.

Because the ALJ provided specific, legitimate reasons supported by substantial evidence for according limited weight to Dr. Riggs and Ms. Nielsen's opinions, this Court finds no error.

## II. The Step-Three Analysis

Ms. McEwen next argues the ALJ erred at step three by not explaining adequately why Ms. McEwen's combined impairments did not meet Listing 1.04, Disorders of the Spine. (Pl.'s Br. 21–22.)

At step three, the ALJ considers whether any of the claimant's impairments meets or equals an impairment listed in the "Listing of Impairments," 20 C.F.R. Part 404, subpt. P, app. 1. *Lax*, 489 F.3d at 1085; 20 C.F.R. § 416.920(a)(4)(iii). If any of the claimant's impairments meets or equals a listing, the ALJ must find the claimant disabled and thus entitled to benefits. *Lax*, 489 F.3d at 1085; *see also* 20 C.F.R. § 416.920(d). However, the plaintiff bears the burden at step three of showing she suffers a severe impairment that meets or equals a listing. *See Ray*, 865 F.2d at 224 (noting "the claimant bears the burden of proving a disability"). "To show that an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment." *Lax*, 489 F.3d at 1085 (citing 20 C.F.R. §§ 404.1525, 416.925).

At step three, the ALJ must discuss evidence relevant to his or her Listing conclusions. See *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). In *Clifton*, the Tenth Circuit found error at step three where "the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment." *Id.* at 1009. Unlike the ALJ decision in *Clifton*, the ALJ Decision here identified Listing 1.04 and provided reasons for finding Ms. McEwen did not meet that listing. (Tr. 16–17.) Specifically, the ALJ identified MRIs of Ms. McEwen's cervical and thoracic spine performed on August 21, 2009. (Tr. 17.) The thoracic spine MRI returned normal. (*Id.*) The ALJ found that "[w]hile diagnostic images reveal some narrowing [in the cervical spine], there is no nerve root impingement shown," and thus concluded Ms. McEwen did not meet Listing 1.04, which requires nerve root compression or spinal arachnoiditis in the case of cervical issues. (*Id.*; Listing 1.04, 20 C.F.R. Part 404, Subpart P, Appendix 1.) Because the ALJ discussed the evidence and reasons for finding Ms. McEwen did not meet Listing 1.04, this Court finds no error at step three.

### III. The Step-Five Analysis

Ms. McEwen next argues the ALJ erred at step five by posing an incomplete hypothetical to the vocational expert and failing to explore a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. 22–24.) The Court disagrees.

Hypothetical questions posed to a vocational expert must precisely reflect a claimant's impairments. *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (citation omitted). "[B]ut they need only reflect impairments and limitations that are borne out by the evidentiary record."

*Id.* (citation omitted).  As discussed above, the ALJ properly discounted opinions inconsistent with the residual functional capacity assessment.  Ms. McEwen had the RFC to

> perform sedentary work . . . except such work could not require:
> 
> - Standing more than 15 minutes or walking more than 15 minutes at one time, nor more than 2 total hours in an 8-hour day;
> - Sitting more than 20 minutes at one time, nor more than 6 total hours in an 8-hour day;
> - Overhead lifting or overhead reaching on more than a 'less than occasional' basis;
> - More than frequent reaching, handling and fingering which means 1/3 to 2/3 of the day;
> - Working at more than a low stress level, which means working only occasionally with the general public;
> - Working at more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks;
> - Working at more than a low memory level, which means the ability to understand, remember and carry out only 'simple' work instructions; and
> - Less than occasional flexion and extension of the neck and < less than occasional twisting of the neck.

(Tr. 17–18.)  The hypothetical the ALJ posed to the vocational expert tracked Ms. McEwen's RFC, asking about an individual who could perform sedentary work with restrictions on sitting, lifting or reaching, handling and fingering, stress level, concentration level, memory level, and flexion and extension of the neck matching the limitations in the RFC.  (Tr. 72–73.)  In response to this hypothetical, the vocational expert determined Ms. McEwen could perform the following jobs:  nut sorter, dowel inspector, final assembler, with a ten percent reduction.  (Tr. 74.)  The ALJ properly declined to include additional limitations in the hypothetical questions posed to the vocational expert that did not reflect Ms. McEwen's RFC, like a "need to lie down during the day." (*See* Pl.'s Br. 22, ECF No. 22.)

Yet before an ALJ may rely on a vocational expert's testimony, "the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999); *see also* SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000) (discussing requirements for ALJ's reliance on vocational-expert evidence). Here, the ALJ asked the vocational expert whether her testimony conflicted with the DOT descriptions of the jobs discussed. (Tr. 76.) The vocational expert identified a conflict between the limitations she described and those contained in the DOT, namely that the DOT descriptions do not discuss all of the limitations discussed by the vocational expert, including the sit/stand option. (*Id.*) When prompted, the vocational expert accounted for this conflict based on her field experience, labor market surveys, and job analyses for the types of positions at issue, which evidenced the availability of jobs with these limitations in the numbers to which the vocational expert testified. (*Id.*) Social Security Ruling 00-4p specifically identifies "other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling" as reasonable explanations for conflicts. SSR 00-4p, at *2. Thus, the ALJ elicited a reasonable explanation for the conflict.

Because the ALJ properly elicited a reasonable explanation for the conflict between the vocational expert's testimony and the DOT, and the hypothetical questions posed to the vocational expert accurately reflected the ALJ's findings with respect to Ms. McEwen's limitations, substantial evidence supports the ALJ's finding that jobs exist in significant numbers that Ms. McEwen can perform.

## CONCLUSION

Based on the foregoing, the Court finds that substantial evidence supports the Commissioner's decision and AFFIRMS the Commissioner's decision in this case.

DATED this 19th day of February, 2014.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge